IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CINCINNATI SPECIALTY
UNDERWRITERS INSURANCE CO.,

        Plaintiff,

v.                                          Case No.  25-2086-JWB

PRIEST ENTERTAINMENT, INC.
REED GODINET, and
TERRY PRIEST,

        Defendants.

## MEMORANDUM AND ORDER

This matter is before the court on cross-motions for summary judgment.  (Docs. 37, 39.) The motions are fully briefed and ripe for decision.  (Docs. 38, 39, 40, 41, 43, 46, 47.)  Plaintiff's motion for summary judgment is GRANTED (Doc. 37), and Defendant Reed Godinet's motion for summary judgment is DENIED (Doc. 39), for the reasons stated herein.

## I.    Facts

The following facts are stipulated or admitted for purposes of this order and are taken from the parties' summary judgment briefs.  (Doc. 38 at 3–11; Doc. 39 at 6–10; Doc. 41 at 4–7.)  Tate's on Moro is a bar/nightclub located in Manhattan, Kansas.  (Doc. 38 at 3.)  Tate's is owned by Defendant Priest Entertainment, Inc.  (*Id.* at 4.)  It is operated by Defendant Terry Priest.  (*Id.*)  It contains an elevated stage for dancing.  (Doc. 39 at 6.)  This stage has a single entry and exit, a stairway on one corner of the stage.  (*Id.*)  The remainder of the stage is surrounded by walls or railings.  (*Id.*)  The single entry and exit violate the city code.  (*Id.*)  On the evening of December 11, 2021, or into the early morning hours of December 12, 2021, Defendant Reed Godinet was on

1

stage at Tate's and was shot and seriously wounded. (Doc. 38 at 3.) Prior to the shooting, the shooter, Joshua L. Cummings, started an "altercation" on the stage. (Doc. 39 at 7.) He pulled out a firearm and "waived it in the air and pointed it towards the crowd" causing people to panic and flee. (*Id.*) The crowd "pushed and shoved" towards the only exit off the stage. (*Id.*) People were trampled and had fallen. (*Id.*) Defendant Godinet attempted to disarm Cummings. (*Id.* at 8.) Godinet was shot in the face and neck. (*Id.*) Multiple witnesses heard a few gun shots followed by a pause of several seconds followed by more gun shots. (*Id.*) Cummings was eventually tackled by a soldier in the U.S. Army. (*Id.* at 9.) But Cummings managed to struggle free and again "shot Godinet in the abdomen while he was trapped against the stage's railing." (*Id.*)

Not surprisingly, Defendant Godinet sued Defendants Priest, Priest Entertainment, and Cummings in Kansas state court for his injuries. (Doc. 38 at 3–4.) The complaint in the state lawsuit advances claims against Cummings for assault and battery. (*Id.*) Cummings was arrested and convicted of multiple criminal offenses for his conduct. (*Id.* at 4.)

The state lawsuit also alleges that Defendants Priest and Priest Entertainment were "negligent in the hiring, training, supervision, and retention of its employees, agents, contractors, and/or volunteers working on the night of the incident." (*Id.* at 5.) Moreover, Priest Entertainment allegedly "failed to maintain the premises in a reasonably safe condition by allowing firearms onto the premises." (*Id.* at 4.) Defendant Priest Entertainment apparently "failed to utilize metal-detecting wands, failed to enforce a prohibition on firearms, failed to provide reasonable and adequate security, failed to warn patrons of dangerous conditions, and failed to remedy dangerous conditions related to firearms on the premises." (*Id.* at 5.) The lawsuit also claims that the "stage at Tate's on Moro" was a dangerous condition "due to overcrowding and limited means of ingress and egress." (*Id.*) On the night of the incident, Godinet alleges that "Tate's on Moro exceeded its

maximum approved occupancy." (*Id.*)  Godinet further alleges that Defendants Priest and Priest Entertainment had "actual and/or constructive notice of the alleged overcrowding and dangerous condition of the stage" and "actual and/or constructive notice that patrons frequently entered Tate's on Moro while carrying firearms." (*Id.*)  According to Godinet, Tate's "voluntarily undertook a duty to provide security and keep firearms off the premises and breached that duty." (*Id.* at 6.)

Plaintiff Cincinnati Specialty Underwriters Insurance Co. (hereinafter "Plaintiff" or "Cincinnati") is an insurer who issued a "Commercial General Liability Policy" to Priest Entertainment that covered the period from May 23, 2021, to May 23, 2022. (*Id.*)  The policy provides certain coverages for "bodily injury and property damage liability" and for "personal and advertising injury liability." (*Id.*)  In relevant parts the terms of the policy provide:

> **COVERAGE A - BODILY INJURY AND PROPERTY DAMAGE LIABILITY**
> **1. Insuring Agreement**
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> > **(1)** The amount we will pay for damages is limited as described in Section **III** – Limits Of Insurance; and
> >
> > **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C.**
> >
> > No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments– Coverages **A** and **B.**
>
> **SECTION B – PERSONAL AND ADVERTISING INJURY LIABILITY**
> **1. Insuring Agreement**
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this

insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit' that may result. But:

> **(1)** The amount we will pay for damages is limited as described in Section **III** - Limits Of Insurance; and

> **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

> No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments - Coverages **A** and **B.**

(*Id.* at 6–7.)  This coverage is limited by "terms, conditions, limitations, and exclusions." (*Id.* at 6.)  One exclusion to the policy's coverage is the "Assault or Battery Exclusion with Limited Optional Coverage." (*Id.*)  This exclusion reads:

**ASSAULT OR BATTERY**
This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

**1.** An actual or threatened assault or battery whether caused by or at the instigation or direction of any insured, their employees, patrons or any other person;

**2.** The failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery; or

**3.** The failure to provide an environment safe from assault or battery, including but not limited to the failure to provide adequate security, or failure to warn of the dangers of the environment that could contribute to assault or battery; or

**4.** The failure to render or secure medical treatment or care necessitated by any assault or battery; or

**5.** The negligent investigation or reporting or failure to report any assault or battery to proper authorities; or

4

**6.** The negligent:

> **a.** Employment;
> **b.** Supervision;
> **c.** Training;
> **d.** Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by the **ASSAULT OR BATTERY** exclusion above.

(*Id.* at 8–9.)  By way of the operation of other language in the agreement, the practical effect of the exclusion is that Cincinnati will only pay out a maximum of $100,000 per occurrence to cover liabilities caused by assault or battery but will pay out a maximum of $1,000,000 per occurrence to cover injuries arising from other occurrences. (*Id.* at 9, 11.)  Cincinnati is also entitled to deduct the costs of its legal defense on behalf of the insured from the amount of coverage. (*Id.* at 9–10.)

Defendant Godinet maintains that his asserted claims in the state court action entitle him to the higher, $1,000,000 coverage limit, unbound by the assault or battery exclusion. (*Id.* at 11.)  By contrast, Cincinnati contends that the $100,000 limit of the assault or battery exclusion applies to Godinet's claims. (*Id.*)  On February 19, 2025, Plaintiff Cincinnati filed this declaratory judgment action under the Declaratory Judgment Act, as codified at 28 U.S.C. §§ 2201–02, seeking clarification of the parties' rights under the insurance agreement before the state court lawsuit proceeds further. (Doc. 1 at 1.)  This court earlier rejected Defendants' attempt to dismiss this action for lack of jurisdiction. (Doc. 27.)  With only legal issues remaining and fully briefed summary judgment motions from Plaintiff and Defendant Godinet, this court is prepared to rule. For the reasons explained below, Plaintiff's motion for summary judgment is granted, and Defendant Godinet's is denied.

**II.    Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)). Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

In considering a motion for summary judgment, the facts set forth in the motion must refer "with particularity to those portions of the record upon which" the moving party relies. D. Kan. R. 56.1(a). "All material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." *Id.* To properly dispute a proposed statement of material fact, the opposing party must "refer with particularity to those portions of the record upon which the opposing party relies." D. Kan. R. 56.1(b)(1). Failure to properly controvert a proposed fact that is properly supported will result in a determination that the fact is admitted. *Coleman v. Blue Cross Blue Shield of Kansas, Inc.*, 287 F. App'x 631, 635 (10th Cir. 2008) (finding that the "district court was correct

to admit all facts asserted in [the movants] summary judgment motion that are not controverted by a readily identifiable portion of the record.") (internal quotation and citation omitted).

### III.    Analysis

The parties' summary judgment motions ask the court to resolve how the insurance coverage agreement applies to Defendant Godinet's state claims.  (Docs. 37, 39.)  But Defendant Godinet also asserts that the clause of the insurance policy that reduces coverage by the amount of costs incurred while defending the insured is against Kansas public policy and should therefore be voided by this court. The court addresses each argument in turn.

### A.    The Agreement

Cincinnati argues that the assault or battery exclusion limits Godinet's possible recovery to $100,000.  (Doc. 38 at 14.)  In support of this argument, it relies on the language of the exclusion which they say applies to any injury that "arise[s] out of an assault and battery."  (*Id.* at 15.) Defendant Godinet disagrees and makes several arguments that under the language of the agreement, and Kansas law, his claims are not covered by the assault or battery exclusion.  (Doc. 43 at 5–12; Doc. 39 at 11–22).

### 1. *Plain Meaning*

The court starts with the plain meaning of the agreement's language.  The relevant language reads:

> **ASSAULT OR BATTERY**
> This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:
>
> **1.** An actual or threatened assault or battery whether caused by or at the instigation or direction of any insured, their employees, patrons or any other person;
>
> **2.** The failure of any insured or anyone else for whom any insured is legally responsible to prevent or suppress assault or battery; or

**3.** The failure to provide an environment safe from assault or battery, including but not limited to the failure to provide adequate security, or failure to warn of the dangers of the environment that could contribute to assault or battery; or

**4.** The failure to render or secure medical treatment or care necessitated by any assault or battery; or

**5.** The negligent investigation or reporting or failure to report any assault or battery to proper authorities; or

**6.** The negligent:

> **a.** Employment;
> **b.** Supervision;
> **c.** Training;
> **d.** Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by the **ASSAULT OR BATTERY** exclusion above.

(Doc. 38 at 8–9.)  Because this list does not "expressly . . . exclude claims for bodily injuries arising from premises liability, negligent construction, entrapment or similar harms", Defendant Godinet posits the policy does not reach such claims.  (Doc. 43 at 11–12.)  Plaintiff disagrees, and so does this court.  (Doc. 46 at 4.)  The court notes at the outset that, despite the enumerations, the exclusion is written in very broad terms.  The first part of the clause reads "This insurance does not apply to 'bodily injury', 'property damage' or 'personal and advertising injury' *arising out of* [. . . .]"  (Doc. 38 at 8-9) (emphasis added).  The phrase "arising out of" already conveys a sense of breadth as it signals a universe broader than just the actual assault or battery itself.

Second, the third enumeration under the assault or battery clause is also expansive and appears to squarely encompass Godinet's claims.  It reads: "[t]he failure to provide an environment safe from assault or battery, *including but not limited to* the failure to provide adequate security, or failure to warn of the dangers of the environment that *could contribute* to assault or battery[.]"

8

(*Id.*) (emphasis added). Godinet claims that dangers within Tate's on Moro at least contributed to his injuries. (Doc. 39 at 18–19.) The construction of the stage and limited access to exits are cited as causes of those injuries. (*Id.*) These claims are covered by the third enumeration. That enumeration indicates that the assault or battery exception will apply to claims that arise out of conditions within the insured environment that "could contribute" to assault or battery "including but not limited to" failure to provide security or failure to warn of dangerous conditions. (*See id.*) This language, particularly the emphasized portions above, is on its face more than sufficient to cover Godinet's claims.

Defendant Godinet also argues that this language is readily distinguishable from other clauses addressed by the Kansas Supreme Court because the "policy does not contain" a clearer modifying phrase such as "out 'of any act or omission in connection with the prevention or suppression of an assault or battery.'" (Doc. 43 at 10) (quoting *First Fin. Ins. v. Bugg*, 962 P.2d 515, 523 (Kan. 1998)). Cincinnati's policy merely states that the insurance does not cover bodily injury "arising out of" several different specifically enumerated kinds of harm relating to assault and battery. (*Id.*) But as explained above, these enumerations are written broadly enough to encompass Defendant's claims.

### 2. *Nature of the Claims*

Still, Defendant Godinet advances a theory based on Kansas case law, that insurance policy exclusions must be "narrow[ly] construct[ed]." (Doc. 39 at 14) (citing *Crist v. Hunan Palace, Inc.*, 89 P.3d 573, 575 (Kan. 2004). "Generally, exceptions, limitations, and exclusions to insurance policies require narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes the duty to define any limitations on that coverage in

9

clear and explicit terms." *Crist*, 89 P.3d at 575 (quoting *Marquis v. State Farm Fire & Cas. Co.*, 961 P.2d 1213 (1988) (internal quotation marks omitted)).

This narrow tailoring, Defendant argues, should lead the court to hold that the assault or battery exclusion is inapplicable to Godinet's claims. But Plaintiff marshals case law of its own, and upon review, the court finds that Plaintiff's case law is more clearly applicable to the instant case. Plaintiff repeatedly invokes the Kansas Supreme Court's decision in *Bugg*. (Doc. 38 at 15–17.) The facts of *Bugg* greatly resemble those here.

In *Bugg*, patrons of a bar were shot. 962 P.2d at 517. The patrons sued the bar for negligence for "(a) firing a gun in a crowded tavern, (b) failing to have exits clearly marked within the tavern, and (c) failing to properly protect patrons from an assailant." *Id.* at 518. Like here, the bar's insurer issued a general policy with exclusions, to include an assault or battery exclusion. *Id.* The exclusion covered "bodily injury, property damage, or personal injury" . . . "[a]rising out of assault or battery, or out any act or omission in connection with the prevention or suppression of an assault or battery." *Id.* (internal quotation marks omitted). The court held that the policy exclusion applied to the bar patrons' claims. *Id.* at 527. In so doing, it made several key observations about the state of the law that apply directly to this case.

As here, the plaintiffs in *Bugg* raised claims of negligence. *Id.* at 518. The Kansas Supreme Court expressly rejected the argument that by pleading negligence, the plaintiffs could avoid the assault or battery exception because assault and battery are intentional torts. *Id.* at 527. "Courts analyzing this issue have consistently held that the theory of liability is irrelevant when the injuries arose out of an assault and battery. Thus, the negligence claims do not affect the applicability of the assault and battery exclusion." *Id.* at 526. The *Bugg* court examined cases from other jurisdictions as well as its own in reaching this conclusion.

10

Defendant Godinet objects to *Bugg* and points to a case he claims is more analogous: *Crist*, 89 P.3d at 573. Defendant cites *Crist* because it construed the policy exclusions to an automobile insurance policy narrowly. *Id.* at 575. In that case, a delivery driver for Hunan Palace struck Crist's vehicle. *Id.* The plaintiff sued Hunan and the driver for negligent operation of a vehicle and negligent training and supervision. *Id.* The insurance policy exclusion read: "This insurance does not apply to . . . 'Bodily injury' or 'property damage' arising out of the ownership, maintenance, use or entrustment to others of any aircraft, 'auto' or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and 'loading or unloading.'" *Id.* at 576–77. The lower court had held that earlier precedents compelled that this exclusion does not cover negligence claims because "the theory of liability rather than the cause of the accident governs coverage." *Id.* at 576 (internal quotation marks omitted). After an exhaustive review of the court's precedents on the matter, the Kansas Supreme Court affirmed this holding. *Id.* at 579–80. Defendant Godinet contends that this court should follow the same logic as the *Crist* court.

But a closer reading of *Crist* reveals an analysis that actually offers some support to Plaintiff rather than Defendant Godinet. In reaching its holding, the Kansas Supreme Court surveyed its precedent in this area, to include Plaintiff's marquee case, *Bugg*. *Id.* at 577-79. The court looked to the same precedent as the lower court, *Marquis*, 961 P.2d at 1213, to identify the rule that "the theory of liability rather than the cause of the accident governs coverage." *Crist*, 89 P.3d at 577. In *Crist*, the court addressed a request to overturn *Marquis*, which was a closely decided case and sparked a "comprehensive" dissent. *Id.* at 578. The court recognized that the rule that *Marquis* and *Crist* rely upon had been considerably distinguished by other cases. *Id.* at 578-79. Indeed, the court recognized that its rule in *Marquis* and *Crist* was arguably in conflict with the rule in *Bugg*. *Id.* at 579 ("Justice Six opined that the *Upland* rule had not been consistently

11

followed in Kansas, citing *Bugg*.").  The Kansas Supreme Court ultimately declined to resolve the conflict in *Crist* on stare decisis grounds.  *Id.* at 579.  But its holding seemingly confined the rule to automobile cases.  *Id.* at 580 ("For many years the law in Kansas has been clear that an insurance exclusion for damage or injury arising *from an automobile* will not exclude a claim based upon negligent supervision.") (emphasis added).

In any case, *Bugg* is not overruled, and it is clearly the more factually analogous case to the one at bar.  Moreover, the *Crist* court's recognition of the difference between *Crist* and *Bugg* implies that the holding and rationale of each should be closely tied to their facts.  Given that *Bugg* is the more analogous case, the court will follow the guidance therein: what matters is the cause of the injury not the theory of liability advanced by the claimant.  962 P.2d at 527 ("Regardless of the language of the allegations, the original cause of the harm arose from an alleged assault and battery.") (quoting *Terra Nova Ins. Co., Ltd. v. Thee Kandy Store*, 679 F. Supp. 476, 478 (E.D. Pa. 1988)).  And moreover, the *Crist* court points towards other authorities that support the *Bugg* rule. *See State Farm Ins. Co. v. Gerrity*, 968 P.2d 270, 272–73 (Kan. Ct. App. 1998) ("But in ignoring the negligence claims made by the plaintiff in [*Bugg*], our Supreme Court reasoned that theories of liability are irrelevant when injuries occur from intentional acts. Therefore, an appellate court should not look to the specific theories of liability alleged but to the underlying cause of the injuries.").  For these reasons, the court rejects Defendant Godinet's attempts to plead causes of action around the policy exclusion.

### 3.  Causation

A third argument advanced by Defendant Godinet is that a court has not yet determined the cause of his injuries.  (Doc. 43 at 8–9.)  He argues that while Plaintiff contends that the "sole cause" of his injury is from the shooting, the injuries he sustained are in fact partly the fault of

12

Priest and Priest Entertainment because of their negligent conduct.  (*Id.* at 8.)  Godinet theorizes that if the state court determines that the negligent construction of the stage is in part the cause of his injuries then that could affect the application of the assault or battery exclusion.  (*Id.*)  But, as Plaintiff explains, the court already rejected this argument in its order on Defendant's motion to dismiss.  (Doc. 46 at 2.)  *See Cincinnati Specialty Underwriters Ins. Co. v. Priest Entertainment, Inc.*, No. 25-2086-JWB, 2025 WL 2966138, at *3 (D. Kan. Oct. 21, 2025) ("The exclusion in the policy is broadly worded to apply to anything 'arising out of' an assault or battery. While Defendant argues that the court must resolve facts that will be developed in the state court action in order to resolve the coverage question, the facts alleged in the state court petition do not allege harms to Godinet that are separate and apart from the shooting. Based on the allegations, the court can make a determination as to whether the coverage exclusion applies without resolving factual disputes or intruding on the state court's fact finding.").

For the same reasons as in the motion to dismiss, Defendant Godinet's argument must fail here as well.  It is indisputable that without the shooting (the assault and battery) by Joshua Cummings, this lawsuit does not exist at all.  For the purposes of deciding how the insurance policy applies, determining the precise breakdown of legal causation is unnecessary.  *See Bugg*, 962 P.2d at 522 (quoting another case that explained "the Texas court of appeals held that the assault and battery exclusion contained in a restaurant's insurance policy precluded coverage for claims made by a couple attacked by an unknown assailant in the parking lot of the restaurant *because the plaintiffs would never have brought the lawsuit absent the assault and battery* committed by the unknown assailant.") (emphasis added) (quoting *Acceptance Ins. Co. v. Walkingstick*, 887 F. Supp. 958, 962 (S.D. Tex. 1995)).  So too here.

    4.  *Comparative Fault*

Finally, and relatedly, Defendant Godinet argues that at this stage, a rule applying the policy exclusion to his claims would not consider the Kansas comparative fault framework, which can allocate the responsibility for harms across multiple defendants. (Doc. 43 at 4–8.) But his argument does not follow. First, Godinet claims that by deciding the exclusion question here "this court [would] end any inquiry into the cause of Godinet's injuries" and thus preclude a division of liability between the shooting and Priest's alleged negligence. (*Id.* at 5.) In support, Godinet cites cases for the proposition that tortfeasors cannot use comparative fault to "eliminate" a tortfeasor's liability. (*Id.*) This argument puzzles the court.

Cincinnati has not invoked comparative liability, and moreover, Cincinnati is not seeking to "eliminate" liability. Rather, Cincinnati is seeking a declaration about how much coverage it owes to its insured and thus to Defendant Godinet. One could argue that Cincinnati is attempting to "eliminate" potentially greater liability, but that obfuscates the true nature of the action. Cincinnati is an insurer attempting to enforce the terms of its agreement. And, according to Godinet, Plaintiff "tendered the $100,000 Limited Optional Coverage limit to Godinet but refused to tender any amount under the general liability portion of the policy under Section A(1), citing the Assault or Battery exclusion. Godinet rejected the offer." (Doc. 39 at 4.) This is hardly elimination, and certainly not the kind of avoidance that attempts to take advantage of comparative fault principles. Godinet's assertion that his injuries "did not arise solely from assault and battery" may be true, but that is not the question before the court. (Doc. 43 at 8.) The court is *not* holding that the only cause of Godinet's injuries was assault and battery, but instead that Godinet's injuries clearly arise out of an assault and battery (regardless of the precise division of liability) which is the relevant question under Kansas law and the Cincinnati policy. *Bugg*, 962 P.2d at 526–27. Without the assault and battery, the parties are not before this court or the state court. And, as

14

Plaintiff points out, Kansas had comparative fault principles when its Supreme Court decided *Bugg*. (Doc. 46 at 3) (citing *Brown v. Keill*, 580 P.2d 867, 876 (Kan. 1978)). This court is not inclined to contravene the Kansas Supreme Court on the applicability of the state's comparative fault framework to cases like the instant one.

### B.    Public Policy

Perhaps anticipating the above result, Defendant Godinet has also moved this court to void as against public policy, the clause of the agreement that enables Cincinnati to deduct its defense costs from any coverage owed. (Doc. 39 at 22.) Godinet contends that because of the legal expenses in this case, if the clause is applied, Defendant Priest will have no coverage left at all, and Defendant Godinet will be unable to recover. (*Id.* at 22–23.) But Godinet does not cite a single Kansas case that alters an analogous insurance agreement. (*Id.* at 22–24.) Instead, he cites legislation and cases from other states and says Kansas should follow suit.

In fact, Godinet's argument is completely unwound by the one Kansas law he does cite: K.S.A. § 40-3107(e). This law mandates *automobile* insurers exclude defense costs from policy coverage. (*Id.* at 24.) But the fact that the Kansas legislature is aware of such exclusions and has chosen to only enact them in the automobile context weighs heavily against this court's judicial imposition of a similar requirement on a different category of insurers.

In his reply brief, Godinet argues for the first time that K.S.A. § 40-2404(1)(a), which prohibits unfair practices in insurance, is what counsels voiding the clause. According to Godinet, Defendant Priest "could never reasonably expect" that the coverage used to insure him would be "swallowed up by attorney fees and costs at such a rate and to such an extent that the coverage would completely evaporate prior to trial—not only leaving Priest without representation during a multi-day jury trial, but leaving him without any financial protection whatsoever when facing a

substantial judgment." (Doc. 45 at 4–5.)  But the court is unwilling to say that the plain language of a major provision of an insurance agreement is "unfair" or "deceptive" based only on Defendant's say so.  K.S.A. § 40-2404.  The coverage of defense costs is a benefit which Priest has received as part of his bargain with Cincinnati.  Even if Cincinnati has spent the $100,000 of coverage on litigation, that's $100,000 that Priest did not spend.  After reviewing the specific insurance practices that K.S.A. § 40-2404 deems unfair, the court does not view the deduction clause as objectionable under the statute.

## IV.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment (Doc. 37) is GRANTED and Defendant Godinet's motion for summary judgment (Doc. 39) is DENIED.

IT IS SO ORDERED.  Dated this 1st day of May, 2026.

s/ John W. Broomes
JOHN W. BROOMES
CHIEF UNITED STATES DISTRICT JUDGE